[887 NYS2d 516]

# K.B., Petitioner, v J.R., Respondent.

Supreme Court, Kings County, October 14, 2009

## APPEARANCES OF COUNSEL

*Fred A. Wertheimer* for petitioner. *Brooklyn Defender Services* (*Jamie Burke* of counsel), for respondent. *Children's Law Center* (*Rebecca M. Brisch*), for the child.

## OPINION OF THE COURT

ESTHER M. MORGENSTERN, J.

Does petitioner have standing to petition the court for custody of a nonbiological child?

Petitioner and respondent began living together in the first months of 1998 and on August 28, 1998 the parties were married in the State of New York. It is not disputed that the parties were aware and discussed the fact that petitioner was born a woman but lived as a man since he was a teenager. On June 8, 1998 petitioner legally changed his name from Cassandra to K.B. Since the age of 15, petitioner adopted the hair style, clothing, demeanor and name of a man. In addition, petitioner received hormone treatments to effectuate a fully masculine appearance. Petitioner plans to undergo gender reassignment surgery in the future. (Petitioner mem of law at 3.)

Respondent stated that "despite knowing KB was born a female JR agreed to marry KB. The couple filled out the marriage certificate together." (Affirmation of respondent ¶ 1.) Respondent contends that the first year of marriage was happy and that in the beginning of the second year the petitioner became physically abusive (1999). After four years of marriage, respondent agreed to conceive a child through artificial insemination with petitioner despite this alleged continued abuse. In 2001 the parties agreed that the mother would undergo artificial

insemination and the parties selected a sperm donor whose characteristics and interests matched those of petitioner. The parties collaborated on, contributed to and supported the artificial insemination process. Petitioner signed the consent form for respondent to be inseminated. The procedure had to be repeated three times before it resulted in a pregnancy which concluded with the birth of the subject child, K.B. Jr., on June 13, 2002. The parties submitted a birth certificate which reflected that petitioner was the father of the child and that respondent was the mother of the subject child. According to the parties, the child was born premature and had to remain in the hospital for over one month after his birth. A letter, dated September 20, 2007, written by Dr. Pinyavat described K.B. Jr. as a "five year old child born premature and asthmatic." (Dr. Carlin evaluation, "Personal and Social History," at 25.) The child has been diagnosed as having asthma, but the parties disagree whether the condition is aggravated by the consumption of dairy products.

On June 7, 2002 respondent received a note from the hospital which stated, "Ms. JR, a married patient, will be hospitalized at St. John's Queens Hospital for an unknown number of days and/or weeks." (Affirmation of attorney for child, exhibit A.) The hospital prepared a letter which stated, "This is to certify Mr. KB, father of KB Jr., was at St. John's Queens Hospital to bring his child home. The infant was discharged today after a lengthy hospital stay." (Affirmation of attorney for child, exhibit B.) It is undisputed that petitioner financially supported the family for approximately six months while respondent took a leave of absence from her employment to care for the infant. The medical and school records of the child reflect that petitioner is the father of the child. According to petitioner, respondent eventually returned to work, worked long hours and spent days away from the marital residence for her employment while petitioner would provide daily care for the child. (Petitioner mem of law at 5.) Sometime after May of 2006 the parties became estranged. It is undisputed that respondent left the marital home in May of 2006 and left the child in the physical custody of petitioner. Although respondent failed to file a petition in Family Court for a temporary order of protection, respondent alleged that she was forced to leave the residence due to the domestic violence perpetrated by petitioner. Petitioner alleged that respondent left the residence to move into the apartment of another man. Respondent further alleged that she left

the marital residence on August 3, 2007 to escape the abuse and that petitioner picked up the child from the babysitter without her knowledge. Respondent never explained why she left the child with petitioner when she did not intend to return to the marital residence.

The parties filed cross petitions for custody of K.B. Jr. Petitioner filed a petition for custody on July 19, 2007. Respondent filed a cross petition for custody on August 6, 2007. Respondent stated in her cross petition that it would be in the best interest of the child if custody of the child was awarded to her since petitioner is actually a woman. In respondent's affirmation it is alleged that petitioner committed acts of domestic violence against her while they lived together and that she feared for the safety of the child. In respondent's custody petition she stated that the petitioner was "actually a woman" and therefore the marriage was "invalid." (Cross petition of J.R., Aug. 6, 2007.)

On August 6, 2007, the same day the cross petition for custody was filed, respondent filed a family offense petition against petitioner alleging that he threatened her with a knife. On August 24, 2007, in Kings County Family Court, Honorable Helene D. Sacco ordered that the child remain in the temporary custody of petitioner and directed that respondent be granted visitation every Sunday. On September 28, 2007 respondent made an application seeking the transfer of temporary custody of the child since petitioner was actually a woman and the child was conceived by artificial insemination. The Family Court declined to hear argument on that application since a proceeding regarding the validity of a marriage could properly be determined only by the Supreme Court.

A court order of investigation was conducted by the Administration for Children's Services (ACS). Respondent acknowledged to the Child Protective Services investigator that the parties agreed to have a child and agreed to use artificial insemination in order to have a child. (ACS report, dated Oct. 19, 2007.) Respondent also acknowledged that she knowingly entered into a relationship with petitioner and willingly entered into a fraudulent marriage despite the fact that petitioner is biologically a woman. The parties openly lived together as husband and wife for four years before K.B. Jr. was born. Respondent never objected that K.B. Jr. acknowledged petitioner as his father and she allowed the child to call petitioner "Dad" without admonition. According to the attorney for the child, K.B. Jr. has

steadfastly referred to petitioner as his father and respondent as his mother. "During my numerous interviews with . . . the child [he] has never wavered in his view that Ms. JR is his mother and Mr. KB is his father." (Affirmation of attorney for child ¶ 35.) The parties attempted to settle the custody and visitation issues concerning K.B. Jr. while petitioner exercised temporary custody and the court granted expanded visitation to respondent. On December 23, 2007, during a visitation exchange, respondent alleged that petitioner threatened her in violation of a temporary order of protection and petitioner was arrested.

On January 8, 2008, the proceedings were transferred to IDV-2 in Kings County Supreme Court. On March 21, 2008, respondent initiated a contested matrimonial proceeding in Supreme Court entitled *JR v KB* (index No. 51263-2008), which was transferred to this court. On May 5, 2008, in the matrimonial proceeding, this court continued the temporary order of custody of the child to petitioner. At the same time, petitioner reported that respondent repeatedly gave the subject child food containing dairy products which aggravated his asthma and neglected to give him his asthma medication as prescribed. The child reported to his attorney, that, at times, he shared respondent's bed with her boyfriend. On July 21, 2008, the parties consented to the issuance of a declaratory judgment in the matrimonial proceeding which adjudged the marriage to be void. Subsequent to the resolution of the matrimonial proceeding, the child reported to his attorney that there was an increased use of derogatory language by respondent about petitioner. Petitioner alleged that respondent used vulgar epithets to refer to petitioner when speaking to the subject child including "bitch," "fucking bitch" and "fucking idiot." (Petitioner mem of law at 6.)

On August 8, 2008, the child made an allegation to his attorney of excessive corporal punishment by respondent which was reported to the court. The child described, to his attorney, that he was struck with a belt on the genitals and on the buttocks by respondent. On August 14, 2008, the temporary order of visitation was suspended. Visitation with respondent was reinstated after further investigation and a series of supervised visits.

On June 16, 2009, respondent made an application to transfer custody of the child pending a fact-finding hearing. The request was based on an allegation that petitioner failed to provide the

child with medical care and for violation of the court direction that petitioner cooperate to assure that respondent would see the child on his birthday although it occurred during petitioner's parenting time.

Respondent moved to dismiss the petition for custody since petitioner had no standing, as a biological stranger, to seek custody or visitation with K.B. Jr. Respondent contends that a proceeding for custody of the subject child cannot be maintained by petitioner, since he is not biologically related to K.B. Jr. and could never have been legally married to respondent and, therefore, he did not have standing to file a petition for custody or visitation. The court directed the attorneys for the parties to submit memoranda of law on the issue. Petitioner contends that the doctrine of equitable estoppel should prevent respondent from claiming that petitioner was not the legal parent of the subject child and that extraordinary circumstances exist to establish the legal standing to petition for custody or visitation. (Mem of law at 2.) The court must determine whether petitioner has demonstrated sufficient extraordinary circumstances to establish standing to maintain a petition for custody. Counsel for the parties served and filed memoranda of law on the issue of whether extraordinary circumstances exist in the case.

The Court of Appeals has held that a nonparent lacked standing to seek the custody of a child over the objection of the parent absent a showing of abandonment, unfitness, neglect, extended disruption in custody or other equivalent that demonstrated "extraordinary circumstances" which would affect the welfare of a child. (*Matter of Bennett v Jeffreys*, 40 NY2d 543, 544 [1976].)

> "[I]ntervention by the State in the right and responsibility of a natural parent to custody of her or his child is warranted if there is first a judicial finding of surrender, abandonment, unfitness, persistent neglect, unfortunate or involuntary extended disruption of custody, or other equivalent but rare extraordinary circumstance which would drastically affect the welfare of the child. It is only on such a premise that the courts may then proceed to inquire into the best interest of the child and to order a custodial disposition on that ground." (*Id.* at 549.)

However, the

> "[s]ecurity, continuity and 'long-term stability' (*Matter of Ebert v Ebert*, 38 NY2d 700, 704) in an

on-going custodial relationship, whether maintained with a natural parent or a third party, are vital to the successful personality development of a child . . .

"[W]here a natural parent has affirmatively brought about or acquiesced in the creation of a secure, stable and continuing parent-child relationship with a third party who has become the psychological parent, there comes a point where the 'rebuttable presumption' which, absent such a change, is employed to favor the natural parent, disappears, as evidentiary presumptions usually do in the face of facts." (*Id.* at 553 [Fuchsberg, J., concurring].)

Once such extraordinary circumstances are found, the court may make a determination on what would be in the best interests of the child. Separation of the mother from the child is one example of extraordinary circumstances. If a court granted standing to petition for custody to a non-biologically-related person it would be tantamount to intervention by the state on behalf of a biological stranger into the relationship of a natural parent and his or her child. This is warranted only when there is evidence to support a finding of extraordinary circumstances.

"Thus, the Court of Appeals . . . has made it abundantly clear that the state, notwithstanding its parens patriae status by which it is charged with promoting the best interests of the child, may not deprive the child of its natural custodian simply upon finding that someone else might serve better in the custodial role." (3 Tippins, New York Matrimonial Law and Practice § 21:13.)

"The law has long been settled in New York that a parent's right to the care and custody of a child is superior to that of all others, absent a showing that the parent has abandoned the child or is unfit to discharge the obligations of parenthood." (*Id.*) A finding of extraordinary circumstances is the threshold burden to be addressed before any examination as to the best interest of the child is made on a petition for custody filed by a nonbiological party. The petitioner bears "[t]he burden of establishing the existence of such extraordinary circumstances" (*see Matter of Nadia Kay R.*, 125 AD2d 674, 676 [2d Dept 1986] [internal quotation marks omitted]). A prolonged separation between the biological parent and the child wherein a "psychological parent" has bonded to the child would satisfy the threshold of extraordinary circumstances and afford standing to a petitioner seeking custody of a child (*Matter of Mary H. v Helen*

*P.*, 131 AD2d 571 [2d Dept 1987]). Psychological bonding between a nonbiological parent and a child has resulted in a court finding that extraordinary circumstances did exist which allowed the nonbiological party to petition a court for custody of a child (*see Doe v Doe*, 92 Misc 2d 184 [Sup Ct, NY County 1977]). Extraordinary circumstances may be found even in the absence of a finding of unfitness by the biological parent. If removal from the custody of a nonparent would cause "significant emotional injury" since a strong bond developed between a child and the nonbiological parent the possibility of that injury would justify a finding of extraordinary circumstances. (*Matter of Curry v Ashby*, 129 AD2d 310, 318 [1st Dept 1987].)

In the case at bar, the proceedings reflect that K.B. Jr. has a strong emotional and psychological bond with petitioner and, in fact, petitioner is the only father that the child has known. This situation was created with the active cooperation of respondent when the parties entered into the "marriage." Petitioner and respondent lived as husband and wife for at least eight years, executed a marriage certificate, completed an artificial insemination consent form, filed a birth certificate which identified petitioner as father of the child, and encouraged K.B. Jr. to accurately and without qualification address and consider petitioner as his father for more than six years.

Respondent contends that petitioner has no standing under Domestic Relations Law § 70 or article 6 of the Family Court Act and that only a biological parent or legally recognized parent has standing to petition for visitation or custody. Respondent contends further that equitable estoppel may not confer standing on a biological stranger who seeks custody or visitation. (Respondent argument ¶ A.)

The circumstances presented, in the case at bar, reflect an "unfortunate" disruption of custody of the biological parent over an extended period of time, the voluntary abdication of physical custody and parenting responsibility by the biological parent under the color of the law since the conception of the child, and the credible allegations of inappropriate parenting decisions by the biological parent which together amount to sufficient compelling circumstances to apply the doctrine of equitable estoppel to the analysis of the total circumstances of the dispute. These circumstances alone support a finding of exceptional circumstances in the case.

The Appellate Division has stated that "a psychological bond . . . is insufficient, *standing alone*, to establish extraordinary

circumstances that would overcome the established right of a legal parent to choose with whom her child may associate." (*Matter of Behrens v Rimland,* 32 AD3d 929, 931 [2d Dept 2006] [emphasis added].)

> "Equitable considerations that arise when a man has been held out by a child's biological mother as the child's biological father in birth and baptismal certificates or in judicial proceedings are not present when a boyfriend, stepfather, or same-sex partner of an adoptive or biological mother seeks visitation or custody of the legal mother's child."
> (*Id.* [citations omitted].)

In the case at bar, petitioner, the legal father at the time of conception and birth of the subject child, is seeking standing to petition for visitation and custody even though the marriage is null and void.

The case at bar is factually distinguishable from *Behrens* in significant ways. In this case, petitioner petitioned for custody while the parties were still married, petitioner was the legal parent of the subject child at conception and birth and respondent gave petitioner full parenting authority over the subject child for almost six years before raising any objection to the arrangement. Petitioner acquired his status as husband to respondent and father to K.B. Jr. for more than six years only because of the active cooperation of respondent for more than nine years. (August 28, 1998 [date of marriage] until September 28, 2007 [first application in Family Court to include an allegation of fraud].) Respondent now seeks to prevent petitioner from having any relationship with the subject child who has only known one person, petitioner, as his father for more than six years. In addition, respondent never explained why when she left the marital residence she left the child in the actual physical custody of petitioner between July and August of 2007 (Family Court and Supreme Court granted temporary custody to petitioner), why she made no effort to set aside the marriage until March 21, 2008, although she alleged the parties were estranged and why she made no issue of the standing of petitioner until he was granted temporary custody of the subject child in Family Court. During the proceedings, there were allegations that respondent used excessive corporal punishment, inadequately supervised the child in her home and failed to attend to the child's health or dietary needs properly. Respondent seeks an order which would transfer custody of the child and deny petitioner standing to petition for custody after fostering the psychological bond be-

tween petitioner father and subject child for almost six years. It is more than likely that if the relationship is terminated it would have a devastating psychological and emotional effect on the child. The biological mother planned, enabled and encouraged the development of a father-son relationship between petitioner and the subject child. Petitioner and the attorney for the child submit that respondent should be equitably estopped from raising the issue of standing under these particular circumstances. The doctrine of equitable estoppel is generally imposed by a court

> "in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought." (*See Nassau Trust Co. v Montrose Concrete Prods. Corp.*, 56 NY2d 175, 184 [1982]; *Matter of Janis C. v Christine T.*, 294 AD2d 496 [2d Dept 2002].)

In the case at bar, respondent is seeking to prevent petitioner from being able to petition for custody or visitation although respondent was complicit in the fraud that engendered the current litigation. These parties cooperated during the artificial insemination of respondent and respondent gave petitioner the parental power to raise the child as his son for more than six years without respondent raising any objection. The fact is that this unimpaired active parenting by petitioner was encouraged by the biological mother without complaint for six years. This alone is an extraordinary circumstance. In addition, during the pendency of the instant proceedings the court granted temporary custody to petitioner before the marriage was adjudged null and void because of child safety allegations from when the child visited the respondent. Respondent failed to explain why she waited to petition for custody, why she failed to exercise her exclusive right of parenthood with the child (as biological parent of the child) or why she encouraged the child to develop a father-son relationship with petitioner over the course of the child's entire life. It is the contention of respondent that there are no extraordinary circumstances present in the case and that equitable estoppel is unavailable under these circumstances. Respondent contended that "[K.B.] fraudulently stated her gender as male on the marriage certificate . . . and cannot through her fraudulent behavior gain the benefit of [Domestic Relations

Law] § 73." (Respondent argument ¶ B.) Respondent does not allude in the papers to the fact that she was complicit in the continued fraud which the parties committed after they executed the marriage certificate: respondent created the records which indicated the parties were married (marriage certificate, artificial insemination consent form, birth certificate), respondent named the subject child K.B. Jr., after petitioner, and respondent received medical benefits for the subject child from petitioner's health insurance, as his spouse. In addition, respondent never explained why she gave petitioner parental authority over the subject child or the reason that respondent left the subject child in the exclusive care of petitioner after she left the marital residence.

An abrupt termination of the father-son relationship which petitioner and respondent together created would "put the child in a situation where his welfare could be affected drastically and, thus, an extraordinary circumstance exists requiring inquiry into the child's best interests." (*Matter of Boyles v Boyles*, 95 AD2d 95, 99 [3d Dept 1983].) In the case at bar, respondent through her words and deeds held out petitioner as the father of the child. In addition, the subject child is now seven years old and the additional years of relationship have dramatically increased the potential for a traumatic effect on the subject child if that father-son relationship with petitioner would be terminated.

Petitioner contends that the totality of the facts of the case establishes extraordinary circumstances sufficient for the custody petition to proceed to a hearing on the best interests of the child. In addition, it is petitioner's further contention that the totality of the circumstances establishes sufficient foundation for the court to estop respondent from raising an issue of standing since respondent has not been honest and her actions created an expectation by the child that the relationship would be something upon which the child could rely. It is not unreasonable to believe that they created an expectation by petitioner that he would have standing to seek custody or parenting time. Petitioner relied on the statements and actions of respondent to enter and foster a relationship with the subject child; if respondent can now preclude petitioner from being heard, no fact-finding will be conducted on the traumatic effect a termination of that father-son relationship, encouraged by respondent for six years, would have on the child.

There are statutory provisions of particular relevance which recognize petitioner's legal status notwithstanding the fact that

the marriage was eventually judicially declared null and void. Domestic Relations Law § 73 establishes parental rights to a child conceived via artificial insemination with the consent of both parties. Such a child is considered the legitimate child of the parents at the time of insemination and the permission of the nonbiological parent is required before another party can adopt that child. (*Matter of Anonymous*, 74 Misc 2d 99 [Sur Ct, Kings County 1973].) Domestic Relations Law § 73 recognizes that any child born to a married woman by artificial insemination performed by persons duly authorized to practice medicine and with consent in writing of the woman and her husband, shall be deemed the legitimate birth child of the husband and wife.

The Appellate Division, First Department, has held that allowing the de facto father of a child to contest the legal relationship between that child and himself, which was ongoing for 11 years, because the de facto parent was not married to the biological mother was error. (*Matter of Diana E. v Angel M.*, 20 AD3d 370 [1st Dept 2005].) A "formulaic approach" that allows only a biological or adoptive parent to be a parent to a child may not always be appropriate (*see Beth R. v Donna M.*, 19 Misc 3d 724, 733-734 [Sup Ct, NY County 2008]). A former husband, who was the nonbiological parent, properly invoked the doctrine of equitable estoppel in order to defend an established relationship between a child and a stepparent. "It is difficult to comprehend how severing that relationship after more than seven years can be anything but detrimental" to a child when "defendant is the only father she has ever known." (*Jean Maby H. v Joseph H.*, 246 AD2d 282, 284 [2d Dept 1998].) In *Jean Maby H.*, the Court, subsequent to *Matter of Alison D. v Virginia M.* (77 NY2d 651 [1991]), recognized that equitable estoppel may confer standing on a biological stranger seeking visitation with a child against the wishes of the biological parent. The Appellate Division, Second Department, has held on more than one occasion that a nonbiological parent may not use that nonbiological status to disclaim responsibility to support a child with whom the party has a parent relationship. (*Wener v Wener*, 35 AD2d 50 [2d Dept 1970].)

In *Matter of Karin T. v Michael T.* (127 Misc 2d 14, 19 [Fam Ct, Monroe County 1985]), the Family Court found that a same-sex and nonbiological parent who actively raised the children of her wife for six years could not disclaim responsibility for the support of the children by reason of "lack of parenthood." The

Supreme Court has the jurisdiction to determine the rights and obligations of parents pursuant to principles of equity. The case involved a respondent who was a female who adopted a masculine identity, married the petitioner after the two obtained a marriage certificate and thereafter participated in artificial insemination procedures which impregnated the petitioner who bore two children of the relationship. The court cited the definition of the term parent as "[o]ne who . . . brings forth offspring." (Black's Law Dictionary 1003 [5th ed 1979].) The court held under the theories of contract and equitable estoppel that the artificial insemination agreement prevented the respondent from raising her nonbiological status to the children as a defense to her obligation to pay support as a parent. The respondent was found to be responsible for support since to hold otherwise would allow her to abrogate her responsibility and benefit from her own fraudulent acts which brought forth the birth of the children. In the case at bar, the Family Court previously determined that respondent should be responsible to pay child support to petitioner before the Supreme Court proceeding commenced.

It is the contention of petitioner that if the application of respondent is granted it would deny him the equal protection rights guaranteed to him under the Constitution of the United States as well as under the New York State Constitution since the request is based on the gender or sexual orientation of petitioner. The application of respondent is silent as to the reason underlying the application to deny petitioner standing to seek custody. The cross petition for custody simply stated that petitioner "falsified documents" to get a marriage certificate and the marriage was invalid and therefore custody should be awarded to respondent (cross petition of J.R., Aug. 6, 2007). The cross petition was silent as to action by respondent who had an essential role in the fraud and deception perpetrated.

The exact quantum of evidence needed by a petitioner to establish extraordinary circumstances may not be clearly or exactly measured, but "the length of time the child has lived with the nonparent, the quality of that relationship and the length of time the biological parent allowed such custody to continue without trying to assume the primary parental role" certainly should be factors to be considered (see Matter of Bennor v Hewson, 47 AD3d 1136, 1137 [3d Dept 2008]).

In the case at bar, the child has known petitioner as his father for his entire life and petitioner has had temporary custody of

the child throughout all of the proceedings. Respondent did not raise the issue of the biological status of petitioner in the proceedings and, in fact, hid it from the child and the rest of the world until petitioner filed a petition for custody of the child. Respondent never sought exclusive parental responsibility for the child until the child was five years old although it is undisputed that she is the biological parent of the child. However, petitioner, the nonbiological parent, enjoyed legal status as husband to respondent and as father to the child through conception, birth and until the child was more than six years old when the marriage was declared null and void. It is not in dispute that the child has a strong emotional and psychological bond with his father despite the fact that there is no biological relationship with the child. Dr. Carlin reported that petitioner "responded sensitively and appropriately" when questioned about any situations or problems that may arise regarding raising K.B. Jr. (Dr. Carlin evaluation, at 41.) On February 17, 2009, a "*Lincoln* hearing" was conducted and the child expressed a strong desire to reside with and maintain a close relationship with the petitioner who he referred to as his "Daddy."

Petitioner contends that the animus that now exists between the parties

> "blinds her to the effect the demand for custody will have on the child. . . . [T]he Respondent again fails to recognize or chooses to ignore how her depriving the Child of the relationship with his father and the father's family would not simply devastate the Child, but might cause him harm extending well beyond childhood . . . creating a greater risk for him psychologically." (Petitioner mem of law at 18.)

The cases cited by respondent are distinguishable on the facts from the case at bar. The case at bar involved a relationship of more than 10 years where the parties were legally married and a child was conceived and born during the marriage, petitioner signed the consent form for the artificial insemination of respondent, petitioner, the nonbiological parent, lived as a man and the parties taught the child to accept petitioner as his father.

Respondent acknowledged that "extraordinary circumstances" would be an exception to the rule that a biological parent who is fit may determine who may associate with her child.

(*Matter of Ronald FF. v Cindy GG.*, 70 NY2d 141 [1987].) This exception is construed narrowly since, although a court may make a better decision than a parent, a parent has a right to constitutional protection of his or her right to decision making. (*Matter of C.M. v C.H.*, 6 Misc 3d 361 [Sup Ct, NY County 2004].) In *Matter of Christopher S. v Ann Marie S.* (173 Misc 2d 824 [Fam Ct, Dutchess County 1997]), a biological parent who was unfit could not raise Domestic Relations Law § 70 as a bar to a petition for custody by a nonbiological party. In the case at bar, it is the contention of respondent that all allegations of improper child care are unproven and therefore are irrelevant. Respondent contends further that since the child is the source of the majority of the allegations that they should not be believed. The subject child may be the most reliable source of information considering the current animosity between the parties. A fact-finding will be held to determine the veracity of the allegations.

A parent of a child has the superior right to custody of that child; however, a paternal grandmother can satisfy the threshold burden of establishing extraordinary circumstances when she has supported the child through an extended disruption of custody where the natural parent voluntarily relinquished care and control of the child. (*Matter of Gilchrest v Patterson*, 55 AD3d 833 [2d Dept 2008].) A same-sex partner can establish extraordinary circumstances in order to seek custody of her former partner's son who had been removed and remanded to a public agency after a finding of neglect (*see Matter of Ms. H. v Columbia County Dept. of Social Servs.*, 16 Misc 3d 1034 [Fam Ct, Nassau County 2007]). In making a determination of whether extraordinary circumstances are present, a court should consider the totality of the circumstances including the length of time the child has lived with the nonparent, the quality of the relationship and the length of time the biological parent allowed custody with a nonparent to continue without attempting to assume the parental role (*id.* at 1037; *Matter of McDevitt v Stimpson*, 281 AD2d 860 [3d Dept 2001]).

In the case at bar, the fact that petitioner is biologically a woman is irrelevant to the question of whether there are exceptional circumstances to grant petitioner standing to petition for custody. One factor relevant to a determination of whether extraordinary circumstances are present is the psychological bonding between the child and nonbiological party. (*Matter of Michael G.B. v Angela L.B.*, 219 AD2d 289 [4th Dept

1996].) The abdication of parental responsibility by the natural parent of the child to a nonbiological party may establish extraordinary circumstances. (*Matter of Bisignano v Walz*, 164 AD2d 317 [3d Dept 1990].) The possible psychological harm of a change in custody from an uncle to the children's father is sufficient to establish the existence of extraordinary circumstances (*see Matter of Scott L. v Bruce N.*, 126 AD2d 157 [1st Dept 1987]). A psychological bond is usually insufficient to establish sufficient extraordinary circumstances for a nonbiological party to be granted standing to seek custody or visitation (*see Matter of Esposito v Shannon*, 32 AD3d 471 [2d Dept 2006]). However in the case at bar, there is much more than a psychological bond between petitioner and the subject child. Respondent consented and encouraged petitioner to share a full parental role in the child's life from birth until August 6, 2007 when respondent declared that petitioner was "actually a woman" although the parties were still "married." At times during the marriage, respondent abdicated all parental responsibilities for the subject child to petitioner. Respondent did not seek an immediate change in custody of the subject child until August 6, 2007 in her cross petition for custody.

■■ A hearing will be held on the cross petitions of the parties. The court holds that based on the statements of the parties contained in their affidavits, the reports submitted, and the court's observations of the demeanor and conduct of the parties in court that petitioner has sustained his burden of proof to establish extraordinary circumstances are present to grant standing to proceed with a petition for custody. The court hereby finds that there are extraordinary circumstances present based on the facts of the case, as presented in the record, and furthermore there are additional equitable considerations present that were created by both of the parties who entered into the marriage. Respondent should be equitably estopped from challenging the standing of petitioner to seek custody since respondent perpetrated the fraud and derived benefits from it until she raised it in the matrimonial action. Respondent admitted that she entered the relationship with full knowledge that petitioner was biologically a woman. Respondent agreed and married petitioner. Respondent received benefits as the wife of petitioner. Respondent agreed and collaborated freely with petitioner in the decision to have a child by artificial insemination. Petitioner signed the consent form as the husband to respondent which was needed to commence the procedure. Re-

spondent freely divided parenting responsibilities with her "husband" for almost six years and fostered a close father-son relationship between the child and petitioner.

The court holds that respondent abdicated her parenting authority to petitioner and actively encouraged the creation of a father-son relationship between petitioner and the subject child. In fact, respondent does not dispute that a close father-son relationship bonds petitioner and subject child together at this time. The finding of extraordinary circumstances is based on the credible allegations made by petitioner which are supported by the record, the reports from ACS, the *Lincoln* hearing, the statements of the parties and the observation of the demeanor of the parties.

For the foregoing reasons it is hereby ordered and adjudged that there are sufficient facts to establish extraordinary circumstances to allow petitioner to petition for custody of the subject child; and it is further ordered and adjudged that there are sufficient circumstances to move the court to apply the doctrine of equitable estoppel to estop respondent from raising the issue of standing of this individual application under the totality of the circumstances.